# EXHIBIT 2

Filing # 128719354 E-Filed 06/14/2021 04:30:14 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO:

BULENT COSGUN,

    Plaintiff,

vs.

SEABOURN CRUISE LINE LIMITED INC., a foreign corporation,

    Defendant.

_____/

## SEAMAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, BULENT COSGUN, by and through his undersigned counsel, and hereby files this Complaint and sues the Defendant, SEABOURN CRUISE LINE LIMITED INC., and in support thereof states as follows:

## BACKGROUND

1. The Plaintiff, BULENT COSGUN ("COSGUN"), was a seaman, crew member and/or business invitee on board the cruise ship M/V SEABOURN ODYSSEY.

2. Respondent, SEABOURN CRUISE LINE LIMITED INC. ("SEABOURN"), is a foreign corporation with its principal place of business in Seattle, Washington. SEABOURN is registered to do business in the state of Florida and has an agent for service of process in the state of Florida.

3. SEABOURN was the Plaintiff's Jones Act employer and at all material times, SEABOURN provided or was required to provide Plaintiff's medical care and treatment.

4. SEABOURN operated vessels, including the vessel involved in this Complaint, out of Florida ports on a continuous and systematic basis, including Port Everglades, Fort Lauderdale, Florida, and could be expected to be called to court in said jurisdiction.

5. SEABOURN was the operator and/or bare boat charterer and/or owner *pro hac vice* of the cruise ship M/V SEABOURN ODYSSEY. The M/V SEABOURN ODYSSEY is a Bahamian-flagged vessel which operated at times out of Fort Lauderdale, Florida.

6. Plaintiff, COSGUN, is a Turkish crewmember who was employed by SEABOURN as a waiter on board the cruise ship M/V SEABOURN ODYSSEY. Said vessel operated in both U.S. and international waters at all times material to this matter.

7. Defendant had and has sufficient contacts with the State of Florida to subject it to the jurisdiction of this State Court.

8. At all times material hereto, Plaintiff's employer was an agent of the shipowner and/or ship operator.

9. At all times material, the Defendant, personally or through an agent:

   a. Operated, conducted, engaged in, or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

   b. Was engaged in substantial activity within this state;

   c. Operated vessels in the waters of this state;

   d. Committed one or more of the acts stated in Florida Statutes, Section 48.081, 48.181, or 48.193; and

   e. The acts of Defendant set out in this Complaint occurred in whole or in part of this county and/or state.

10. On September 16, 2019, while in the performance of his duties on board the vessel stated above and while employed by SEABOURN, COSGUN slipped and fell on a flooded deck that was covered in water leaking from a broken water line. His accident was witnessed by two Philippine crewmembers who were standing near the area of the spill.

11. COSGUN could not see the water that was spilled as it was located around a corner. As he turned the corner he immediately slipped. The crewmembers who had a clear view of the spill prior to Plaintiff's accident failed to warn him of the spill, failed to clear the spill, failed to post signs warning of the spill, and failed to block off the area of the spill prior to COSGUN's accident.

12. Plaintiff had pain in his lower back and neck immediately upon his fall. He reported his accident immediately to his supervisor and treated the same day at the vessel's infirmary.

13. On September 16, 2019, Plaintiff reported to the infirmary with complaints of lower back pain that was aggravated by movement. He was given painkillers.

14. He returned to the infirmary on September 18, 2019 and reported ongoing back pain. He was referred to an Orthopedic specialist by Dr. Van Der Merwe, and he was declared unfit for duty.

15. Before signing off from the vessel, Plaintiff was given steroid injections in his lower back which were unsuccessful in relieving his back pain.

16. On September 24, 2019, Plaintiff was seen at Sisli Kolan International Hospital by Dr. Mikat Kaya who ordered an MRI. The lumbar MRI ordered by Dr. Kaya showed that there was loss of signal intensity between the L2-L5 discs, a posterocentral wide protrusion that was seen along the annular tear at the L2-3 disc, a posterocentral extruded herniation at the L3-4 disc, a posterior left paramedian protrusion at the L4-5 disc, and a posterocentral small protrusion at the

L5-S1 disc. Plaintiff was diagnosed with a protrusion at the left L4-5 level, and an extruded disc hernia at the L3-4 level. Dr. Kaya recommended surgery.

17. On September 27, 2019, Plaintiff was diagnosed with an extruded herniated disc which was migrating on the L3-4 level to his spinal nerves and he was recommended to undergo surgery by Dr. Kaya.

18. On October 3, 2019, Plaintiff reported to a Neurosurgery Specialist, Dr. Akkor, with complaints of back pain that was so severe he was unable to walk. Dr. Akkor diagnosed him with a right L3-L4 disc hernia and recommended a lumbar microdiscectomy as soon as possible. He was also recommended to avoid hard movements for the body and physical work.

19. On July 2, 2020, Plaintiff's severe lower back pain was treated with an anterior epidural injection at L4-5 by Dr. Kamer Dere.

20. On December 11, 2019, Plaintiff was seen at Kolan International Hospital for severe neck and left arm pain that caused numbness and loss of strength. Dr. Yasin Yetisyigit diagnosed him with cervical disc disorder, radiculopathy, and a herniated disc at the L3-4 level. Dr. Yetisyigit completed a cervical spine MRI and found an indented diffuse bulging disc which was compromising the dural sac of Plaintiff's spinal cord at C3-4.

21. On January 7, 2020, Plaintiff was again seen at Kolan International Hospital for lower back pain. He was given a steroid injection and Dr. Demir recommended an orthopedic or neurosurgical examination.

22. On January 11, 2020, Plaintiff saw Dr. Akkor for lower back pain that caused numbness in his legs. Dr. Akkor recommended an MRI.

23. On February 5, 2020, Plaintiff underwent a Lumbar MRI which showed a left foraminal stenosis in L4-5 level and an extruded hernia migrating to the central inferior at the L3-4 level.

24. On February 29, 2020, Plaintiff underwent a Lumbar bilateral L4-L5 microdiscectomy and micro-decompression using a bilateral incision to relieve his severe pain being felt from his lumbar and intervertebral disc disorders.

25. On March 6, 2020, Dr. Akkor reported that Plaintiff could not walk due to his severe back and leg pain. Dr. Akkor had recommended that the Plaintiff should rest for twenty days.

26. Dr. Akkor did cervical dorsal point injections on or about March 26, 2020 which were unsuccessful in relieving MR. COSGUN's pain.

27. On June 3, 2020, Plaintiff reported that he had lower leg pain which was so severe his leg was heavy and numb for the past few months. He was diagnosed with Lumbar and other intervertebral disc disorders with radiculopathy by Dr. Erman who recommended a lumbar MRI and EMG.

28. On June 23, 2020, Plaintiff was seen by Dr. Kamer Dere for lower back pain, and his MRI showed a bilateral L4-5 epidural granulation tissue. A L4-5 transforaminal anterior epidural steroid injection and L4-5 epidural lysis under sedation was recommended.

29. On July 2, 2020, Plaintiff was seen for his lower back pain Dr. Kamer Dere. He was treated with a Left and Right L4-5 and epidural lysis.

30. On August 8, 2020, Plaintiff was diagnosed with lower back pain that caused a burning pain in his feet. Dr. Dere followed up with an MRI and prescribed Plaintiff with painkillers.

31. On August 10, 2020, Plaintiff underwent a Lumbar Spine MRI, and he was diagnosed with annular bulging and annular fissures in the L2-3 disks, central annular fissures and diffuse annular bulging in the L3-4 disks, Osteodegeneration in the L4-5 facets that was more significant in the right side, and minimal annular bulging in the LS-S1 level.

32. On August 11, 2020, Plaintiff was again diagnosed with lower back pain that radiated to his foot causing an intense stinging and burning sensation. An EMG was performed, and it found an entrapment neuropathy in the left peroneal nerve.

33. On August 27, 2020, Dr. Dere indicated that that an operation may be necessary.

34. On September 24, 2020, Plaintiff was diagnosed with lumbar and other intervertebral disk disorders with radiculopathy that caused extreme pain and numbness in his legs. Hypoesthesia and paresthesia in left L5 dermatome was also noted by Dr. Erman who recommended surgery. Plaintiff then underwent a microdiscectomy back surgery at the L3/L4 level as well as a foraminotomy at the L5 level.

35. On September 25, 2020, Dr. Ziya Akar reported that the Plaintiff's legs had extreme pain, numbness, and malaise. Dr. Akar also reported that the EMG done on August 27, 2020 showed entrapment neuropathy on the fibula head level in the left peroneal nerve, and on June 23, 2020 an increase in peroneal nerve affection was detected. Dr. Akar ordered a nerve decompression operation. Plaintiff underwent the nerve decompression and is in recovery presently.

36. On January 28, 2021 MR. COSGUN underwent a peroneal nerve release on his left lower leg by Dr. Enis Donmez.

37. Plaintiff has yet to properly be declared to be at maximum medical cure ("MMC") for his lower back pain or neck pain.

38.     Plaintiff has been severely injured and can no longer work as a Jones act seaman in his chosen profession.

### COUNT I – JONES ACT NEGLIGENCE

39.     Plaintiff incorporates paragraphs one through thirty-eight above as if set forth fully herein and further states:

40.     At all times material hereto, the Respondent owed the Plaintiff the highest standard of care under the Jones Act, 46 USC 688. It is the Respondent's responsibility to provide the Plaintiff with a reasonably safe vessel, with a safe place to work, to adequately maintain said vessel and to remedy unreasonable defects that the Respondent knew of or in the exercise of reasonable care should have known.

41.     On or about September 16, 2019, the Plaintiff was severely injured a result of the negligence of SEABOURN CRUISE LINE as follows:

   a. Failure to provide a safe place to work by failure to properly assess the risks of the various job tasks and activities the Plaintiff was assigned to during the times he was working aboard the M/V SEABOURN ODYSSEY. See *Cabezas v. United States*, 2007 U.S. Dist. 72625 (N.D. Ca. 2007).

   b. Failure to provide a safe place to work by failing to implement appropriate safety precautions and procedures based on ergonomic studies reflecting the risk of injuries for the various types of job tasks and activities crewmembers are required to perform onboard the vessels.

   c. Failure to properly evaluate the different job tasks and activities required of the Plaintiff in order to implement appropriate safety precautions to avoid the type

of injuries Plaintiff suffered as a result of the excessive and physically taxing job tasks and activities.

d. Negligently assigning Plaintiff to a duty the involved unreasonable risk of harm. See *Moreno v. Grand Victoria Casino*, 94 F.Supp.2d 883 (N.D. Il. 2000).

e. Failing to consider Plaintiff's physical limitations in assigning his to duties for which he was not physically suited. See *Fletchis v. Union Pacific Railroad*, 621 F.2d 902, 909 (8th Cir. 1980); *Moreno, supra.*

f. Failure to provide a safe place to work by failure to have the ship's doctors, shoreside doctors and supervisors communicate with each other about the physical capacities of the Plaintiff the type of complaints he was expressing regarding his physical condition, and failing to properly evaluate his physical injuries and capabilities and then determine the appropriateness of the various job tasks and activities that would be required of the Plaintiff if he was returned to work.

g. Failure to provide a safe place to work by assignment of the Plaintiff to job tasks and activities that posed unreasonable risks of injury to the Plaintiff.

h. Failing to provide a safe place to work by failing to implement a reasonable work schedule which would not have required the Plaintiff to work an excessive number of hours, seven days a week without adequate rest breaks and exercises.

i. By failing to provide prompt, proper and adequate medical care and treatment, which SEABOURN in failing to provide Plaintiff adequate time off work and light duty following the injury to his feet, lower back, and neck, which caused or contributed or aggravated his condition.

j. Negligently assigning the Plaintiff to work that caused his to suffer injuries to his lower back, and neck.

k. Failure to properly assess the work place for hazards and to correct the hazards.

l. By requiring the Plaintiff to work an excessive amount of hours each day which caused his to over-exert himself to the point of suffering severe injury to his feet, lower back, and neck.

m. By not allowing adequate rest breaks which resulted in over-exertion, which caused Plaintiff to suffer severe injury to his feet, lower back, and neck.

n. By assignment of the Plaintiff to such a multitude of tasks, that required excessive amounts of lifting, bending, stooping, twisting and carrying items on a repetitive basis, in a hurried fashion, which put the Plaintiff's body at risk for suffering overexertion type injuries to his lower back and neck, which in fact occurred.

o. By assigning to the Plaintiff physically taxing job tasks which were unreasonably dangerous to his health.

p. By failure to investigate and recognize the health hazards to the Plaintiff that were present in performing the multitude of job tasks required of his in the manner prescribed by the Respondent SEABOURN .

q. By failure to properly supervise the work place in order to avoid over-exertion type injuries, and overworking the crewmembers to the point of suffering injury.

r. By failing to adopt and implement reasonably safe methods of operation in the work place.

    s. By failure to conduct appropriate ergonomic studies of the work place and implement safe methods and practices of work in order to avoid injuries.

    t. Failure to provide a safe work place.

    u. Failure to provide a reasonably safe place to walk.

    v. Failure to warn of a dangerous condition in an area where Plaintiff was expected to walk.

    w. Failure to block off the dangerous condition located in an area where Plaintiff was expected to walk.

    x. By the vicarious liability of Plaintiff's co-worker who failed to reasonably and safely warn Plaintiff of the unsafe condition, said negligence is imputed to Respondent.

    y. Failure to provide Plaintiff with prompt, proper and adequate medical care and treatment.

    z. Negligently sending Plaintiff back to work on pain killers at full duty after he reported his injuries.

    aa. Negligently failing to sign Plaintiff off the vessel for appropriate shore side medical care with a specialist.

    bb. Other negligence to be shown at the time of trial.

42. Defendant knew or in the exercise of reasonable care should have known of the unsafe condition and had the opportunity to either cure the condition or warn the Plaintiff of the condition before he was injured. Defendant therefore had actual and/or constructive notice of the dangerous condition prior to Plaintiff's accident.

43. As a direct and proximate result of the negligence of the Respondent, its agents and/or employees, the Plaintiff was caused to suffer severe bodily injury and permanent injuries to his lower back and neck, was incapacitated from work, will in the future be unable to fully engage in his vocation as a crew member, and/or any other occupation requiring the full use of his body and limbs. As a further direct and proximate result of this injury suffered by the Plaintiff, the Plaintiff has and will suffer pain and mental anguish and has incurred medical expenses for the alleviation of his injuries, suffered a diminishment of earning capacity as well as lost wages and has lost the enjoyment of leading a normal life, all of which injuries are permanent and continuing in nature.

WHEREFORE Plaintiff, BULENT COSGUN, sues and demands judgment against the Respondent, SEABOURN CRUISE LINE LIMITED INC., for all damages as allowed under the General Maritime Law and for any other damages, including interest, attorney's fees, and costs, that this Tribunal may deem fit and proper.

## COUNT II - UNSEAWORTHINESS

44. Plaintiff incorporates paragraphs one through thirty-eight above as if set forth fully herein and further states:

45. Moreover, at all times material hereto the Respondent owed the Plaintiff the duty to provide a seaworthy vessel and to provide the Plaintiff a safe place to work.

46. On or about September 16, 2019, and thereafter, the Plaintiff was severely injured as a result of the unseaworthiness of the vessel as follows:

    a. The M/V SEABOURN ODYSSEY was unsafe and unfit due to the conditions created by Respondent's conduct.

b. The M/V SEABOURN ODYSSEY was unsafe and unfit due to the conditions of work which resulted in Plaintiff's injuries.

c. The M/V SEABOURN ODYSSEY was not reasonably fit for its intended purpose by virtue of the unsafe conditions Plaintiff was required to work under.

d. The vessel's crew was not properly trained, instructed, or supervised.

e. The vessel did not have a fit crew.

f. The vessel did not have a reasonably fit medical staff.

g. The vessel did not assign adequate manpower for the tasks being performed.

h. Failure to conduct proper job analysis and risk of harm analysis.

i. The job methods and procedures were not reasonably fit for the intended purpose as it posed an unsafe method of operation and an unreasonable risk of injury.

j. By having job tasks assigned to the Plaintiff which required his to utilize body mechanics that put his body at risk of injury.

k. By requiring the Plaintiff to lift and carry excessive amounts of weights on a repetition basis, which posed unreasonable risks of harm to the Plaintiff. As a result, the job methods and procedures were not reasonably fit for their intended purposes.

l. Failure to have proper procedures in place to ensure that Plaintiff was physically fit to return to work after being injured which aggravated Plaintiff's injuries and caused his additional pain and suffering.

m. The tools and manpower assigned to perform the tasks Plaintiff was required to perform were not fit for the intended purposes.

- n. Due to an unsafe working environment.
- o. Failure to provide a safe place to walk.
- p. Failure to warn of a dangerous condition in an area where Plaintiff was expected to walk.

47. As a direct and proximate result of the unseaworthiness of the vessel, the Plaintiff was caused to suffer severe bodily injury and permanent injuries, was and still is incapacitated from work, will in the future be unable to engage in Plaintiff's vocation as a boat worker and or any other occupation requiring the full use of his body and limbs. As a further direct and proximate result of this injury suffered by Plaintiff, the Plaintiff has and will continue to suffer pain and mental anguish and has incurred medical expenses for the alleviation of his injuries, suffered a diminishment of earning capacity as well as lost wages and has lost the enjoyment of leading a full and active life.

WHEREFORE Plaintiff, BULENT COSGUN, sues and demands judgment against the Respondent, SEABOURN CRUISE LINE LIMITED INC., for all damages as allowed under the General Maritime Law and for any other damages, including interest, attorney's fees, and costs, that this Tribunal may deem fit and proper.

### COUNT III – FAILURE TO PROVIDE MAINTENANCE AND CURE

48. Plaintiff incorporates paragraphs one through thirty-eight above as if set forth fully herein and further states:

49. Furthermore, Plaintiff has not been paid his full wages or maintenance, nor most of his cure, and has been responsible for portions of his own medical care, his own maintenance and all other sums needed to protect himself from the injury he suffered on board the M/V SEABOURN ODYSSEY.

50. The Respondent, through its agents, servants and/or employees, arbitrarily, capriciously, willfully and in bad faith did not take all reasonable steps to provide proper maintenance and cure.

51. The Respondent, through its agents servants and/or employees, acted in a callous and recalcitrant manner depriving the Plaintiff of needed medical treatment, which aggravated his already serious injury and during this period of time.

52. Respondent's failure to supply Plaintiff with any maintenance and cure is willful, arbitrary, capricious, and in callous disregard for Plaintiff's rights as a seaman. As such Plaintiff is entitled to punitive damages and attorney's fees under the general Maritime Law of the United States.

53. As a direct and proximate result of the Respondent's failure to provide maintenance and cure as set forth above, the Plaintiff was caused to suffer severe bodily injury and permanent injuries, was and still is incapacitated from work, will in the future be unable to engage in Plaintiff's vocation as a boat worker and or any other occupation requiring the full use of his body and limbs. As a further direct and proximate result of this injury suffered by Plaintiff, the Plaintiff has and will continue to suffer pain and mental anguish and has incurred medical expenses for the alleviation of his injuries, suffered a diminishment of earning capacity as well as lost wages and has lost the enjoyment of leading a full and active life.

WHEREFORE Plaintiff, BULENT COSGUN, sues and demands judgment against the Respondent, SEABOURNCRUISE LINE, for all damages as allowed under the General Maritime Law and for any other damages, including punitive damages, and including interest, attorney's fees, and costs, that this Tribunal may deem fit and proper.

## COUNT IV – FAILURE TO PROVIDE PROMPT, PROPER AND ADEQUATE MEDICAL CARE

54. Plaintiff incorporates paragraphs one through thirty-eight above as if set forth fully herein and further states:

55. It was also Respondent's duty to provide Plaintiff with prompt, proper and adequate medical care. Respondent negligently failed to promptly provide Plaintiff with prompt, proper, adequate, and complete medical care. This conduct includes but is not limited to:

   a. Respondent not giving Plaintiff medical care in a timely manner; and/or

   b. Respondent not providing or arranging for Plaintiff to visit an dermatologist specialist to address Plaintiff's injuries; and/or

   c. Plaintiff was forced to seek out attorneys to assist his in getting adequate medical care; and/or Respondent's physicians negligently failed to provide curative treatment to Plaintiff's skin, toe, and lungs;

   d. Respondent's physicians negligently failed to provide Plaintiff therapy for injuries; and

   e. Respondent's physicians negligently sent Plaintiff back to work in an injured and compromised condition.

56. As a direct and proximate result of Respondent's failure to provide medical care as set forth above, Plaintiff suffered additional pain, disability and/or Plaintiff's recovery was prolonged. In addition, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain and suffering, mental anguish, reasonable fear of developing future physical and medical problems, loss of enjoyment of life, physical disability, impairment, inconvenience on the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability,

disfigurement, aggravation of any previously existing conditions therefrom, incurred additional medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost wages, income lost in the past, and Plaintiff's working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

57. This Count is alleged separately from Jones Act Negligence pursuant to *Joyce v. Atlantic Richfield Company*, 651 F.2d 676 (10th Cir. 1981) which states, in part, "Negligent failure to provide prompt medical attention to a seriously injured seaman gives rise to a separate claim for relief [for which separate damages are awardable]."

58. Respondent failed to properly provide Plaintiff with prompt, adequate, and complete medical care. Respondent's failure contributed to Plaintiff's additional pain, disability, and/or prolonged Plaintiff's recovery.

59. Plaintiff further hereby reserves all rights arising under the Collective Bargaining Agreement and/or Bahamian law and asserts claims under such regimes to the extent that they are not inconsistent with his general maritime law claims stated above.

WHEREFORE Plaintiff, BULENT COSGUN, sues and demands judgment against the Respondent, SEABOURN CRUISE LINE LIMITED INC., for all damages as allowed under the General Maritime Law and for any other damages, including interest, attorney's fees, and costs, that this Tribunal may deem fit and proper.

### COUNT V - DISABILITY BENEFITS UNDER SEABOURN'S CBA

60. Plaintiff incorporates paragraphs one through thirty-eight above as if set forth fully herein and further states:

61. Plaintiff's injuries arose from a work-related accident that he suffered on board SEABOURN's ship. He is no longer able to work as a seaman with his current restrictions.

62. SEABOURN's Collective Bargaining Agreement, Article 21, provides:

> A Seafarer who suffers a disabling permanent injury because of an accident from any cause whatsoever whilst in the employment of Norwegian, regardless of fault, including accidents occurring whilst traveling to or from the Ship and whose ability to work is reduced thus thereof, shall in addition to his Sick Pay, be entitled to compensation per the provisions of this Agreement.
>
> The compensation which Norwegian, Manager, Manning Agent, and any other legal entity substantially connected with the vessel shall be jointly and severally liable to pay shall be calculated by reference to an agreed medical report, with SEABOURN and the Seafarer both able to commission their own and when there is disagreement the Union and SEABOURN shall jointly appoint a third doctor from the "List of Doctors approved to carry out duties according to Regulations of 19th October 2001 no. 1309 concerning the medical examination of employees on Ships" issued by the SEABOURN Maritime Directorate, as amended from time to time, whose findings shall be binding on all parties. The aforesaid medical report determines the Degree of Permanent Disability and the table below the Rate of Compensation.

Degree of Permanent Disability:  Rate of Compensation:

Groups:

| B, C2, C4 & D | A, C1 & C3% | |
|---|---|---|
| USD | USD | USD |
| 100 | 100,000 | 140,000 |
| 75 | 75,000 | 105,000 |
| 60 | 60,000 | 84,000 |
| 50 | 50,000 | 70,000 |
| 40 | 40,000 | 56,000 |
| 30 | 30,000 | 42,000 |
| 20 | 20,000 | 28,000 |

| 10 | 10,000 | 14,000 |

with any differences, including less than 10% disability, to be pro-rated.

Regardless of the degree of disability, an injury as described in the first paragraph of this Article which results in loss of profession will entitle the Seafarer to the full amount of compensation, USD one-hundred-thousand (100,000) for Ratings (Groups B, C2, C4 & D) and USO one-hundred-and-forty- thousand (140,000) for Officers (Groups A, C1 & C3). For the purposes of this Article, loss of profession means when the physical condition of the Seafarer prevents a return to sea service, under applicable national and international standards or when it is otherwise clear that the Seafarer's condition will adversely prevent the Seafarer's future of comparable employment on board ships.

Any payment effected under this clause shall be without prejudice to any claim for compensation made in law and made without any delay using the IMO/ILO Model Receipt and Release Form for Contractual Claims, Annex 6, and shall be credited toward any further claims that the Company may be responsible for.

63. Under the CBA Plaintiff is entitled to compensation for his injuries. Due to the fact that he has suffered back and neck injuries at work he will not be capable of working as a seaman any longer. Therefore, under SEABOURN's CBA Plaintiff is entitled to $100,000 in disability benefits.

64. Said benefits should not be offset against Plaintiff's medical care that is owed. The CBA states separately, at Article 19, that:

> While serving on board, a sick or injured Seafarer shall be entitled to reasonable medical treatment at SEABOURN's expense. If the Seafarer is sick or injured as of the termination of the Contract Period, the Seafarer shall be entitled to reasonable medical treatment and maintenance, either "in kind" (that is, room and board provided by SEABOURN or per diem payments of USO fifteen (15) at the sole discretion of SEABOURN until the Seafarer is declared to have reached maximum medical cure (MMC).

65. Plaintiff therefore has an independent right to his medical care separate and apart from his claim for disability benefits.

WHEREFORE Plaintiff, BULENT COSGUN, sues and demands judgment against the Respondent, SEABOURN CRUISE LINE LIMITED INC., for all damages and benefits as allowed under the contractual provisions of the operative Collective Bargaining Agreement, under the general maritime law, and for any other damages, including interest, attorney's fees, and costs, that this Tribunal may deem fit and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff, BULENT COSGUN, demands a trial by jury of all issues so triable as a matter of right.

Dated: This __14th__ day of June, 2021.

Respectfully submitted,

BILLERA LAW
2201 N.W. Corporate Blvd.
Suite 200
Boca Raton, FL 33431
Tel: 561-500-7777
Fax: 561-500-7778
By: __s/John Billera__
   JOHN F. BILLERA, ESQ.
   Florida Bar No.: 869041
   Attorneys for Plaintiff
   john@billeralaw.com