UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-61378-ALTMAN/Hunt

BULENT COSGUN,

　　　*Plaintiff,*

*v.*

SEABOURN CRUISE
LINE LIMTED INC.,

　　　*Defendant.*

_____/

## ORDER GRANTING MOTION TO COMPEL ARBITRATION

Our Plaintiff, Bulent Cosgun—a crewmember aboard the M/V Seabourn Odyssey (a cruise ship)—agreed to arbitrate any dispute he might have with his employer, Seabourn Cruise Line Limited ("Seabourn"). But, after injuring himself aboard the Odyssey, Cosgun bypassed the parties' agreement and sued Seabourn in state court. Seabourn removed the case to us and promptly moved to compel arbitration. Cosgun responded by urging us to remand his case to state court. After careful review, we conclude *both* that we have jurisdiction to compel arbitration *and* that we *must* compel the parties to arbitrate in the Southern District of Florida. We, therefore, **GRANT** Seabourn's Motion to Compel Arbitration [ECF No. 26] and **DENY** Cosgun's Motion to Remand [ECF No. 27].

### THE FACTS

### I.     Background

Cosgun is a citizen of Turkey and a "seaman" by trade. Complaint [ECF No. 1-2] ¶¶ 1, 6. On December 3, 2018, Seabourn hired Cosgun to work "as a waiter on board the cruise ship M/V SEABOURN ODYSSEY." *Id.* ¶ 6; *see also* Seafarer's Employment Contract [ECF No. 26-3] at 2. On September 16, 2019—while working on the Odyssey—Cosgun "slipped and fell on a flooded deck that was covered in water leaking from a broken water line." Complaint ¶ 10. As a result of his fall,

Cosgun sustained injuries that required everything from "steroid injections," *id.* ¶ 15, to "back surgery," *id.* ¶ 34. Because of these injuries, Cosgun says, he "can no longer work . . . in his chosen profession." *Id.* ¶ 38.

## II.     The Arbitration Agreement

On December 27, 2017, Seabourn and the Norwegian Seaman's Union entered into a Collective Bargaining Agreement (the "Agreement"), which delineated "the terms and conditions of employment of seafarers serving onboard vessels owned, operated or managed by Seabourn Cruise Line Limited[.]" Agreement [ECF No. 26-4] at 2. The Agreement took effect on January 1, 2018. *See ibid.* In Cosgun's signed employment contract, he agreed to "abide by the terms and conditions set forth in the Collective Bargaining Agreement[.]" Seafarer's Employment Contract at 2. The Agreement included an arbitration provision, which reads as follows:

> If not resolved by the Unions, the Owners/Company, and/or the Seafarer as provided in the Dispute Resolution Procedure above, all grievances and any other dispute whatsoever, whether in contract, regulatory, statutory, common law, tort or otherwise relating to or in any way connected with the Seafarer's service for the Owners/Company under this Agreement, including but not limited to claims for personal injury/disability or death, no matter how described, pleaded or styled, and whether asserted against the Owners/Company, Master, employer, Vessel owner, Vessel or Vessel operator shall be referred to and resolved exclusively by mandatory binding arbitration pursuant to the United Nations Conventions [sic] on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958), 21 U.S.T. 2517, 330 U.N.T.S. ("The Convention"), except as provided by any government mandated contract. In addition, Seafarer agrees to arbitrate any and all disputes regarding the existence, validity, termination, or enforceability of any term or provision in this Agreement.

Agreement at Art. 35(1). In our case, the "Seafarer" is Cosgun—the "person who is employed or engaged or works in any capacity onboard a ship." *Id.* at Art. 1(C)(1). And Seabourn is the "Owner[]/Company[.]" *Id.* at Art. 35(2). The Agreement provides that "arbitration shall take place in such place as is agreed upon by the Unions, Owners/Company and Seafarer." *Id.* at Art. 35(3). But, "[i]n the event that all three parties are unable to agree upon an alternative location, the agreement of any two of the three shall prevail." *Ibid.*

### III.   Our Case

On June 14, 2021, Cosgun sued Seabourn in the 17th Judicial Circuit in and for Broward County, Florida. *See generally* Complaint; *see also* Notice of Removal [ECF No. 1] ¶ 7. In his state-court complaint, Cosgun asserted five claims: (1) Jones Act negligence (Count I); (2) unseaworthiness (Count II); (3) failure to provide maintenance and cure (Count III); (4) failure to provide prompt, proper, and adequate medical care (Count IV); and (5) disability benefits under the Agreement (Count V). *See* Complaint ¶¶ 39–65. Seabourn—citing 9 U.S.C. § 205 and 28 U.S.C. § 1441—removed the case here. *See generally* Notice of Removal. Once in federal court, Seabourn filed a Motion to Compel Arbitration [ECF No. 3], and Cosgun responded with his own Motion to Remand [ECF No. 11].

After reviewing the parties' briefs, we found that both sides had failed to "address the critical issue" in the case. March 24, 2022 Hearing Transcript ("Hr'g Tr.") [ECF No. 23] at 4:2–3. So, we brought the parties in for a hearing, *see* Paperless Minute Entry [ECF No. 21], where we explained, in detail, what we thought was *really* at issue in the case—namely, whether (as a *prerequisite* to our jurisdiction to compel arbitration) the parties' agreement needed to specify that arbitration would take place in a signatory nation.[1] *See* Hr'g Tr. at 10:13–15 ("[T]hat suggests to us that there really is no requirement that the arbitration agreement include the forum of arbitration as a jurisdictional prerequisite."). And we told the parties that we were going to "deny both motions without prejudice," *id.* at 17:6–7; give them a chance to "research these issues," *id.* at 4:18; and allow them to brief the "elephant in the room," *id.* at 17:7. Once the parties refiled their briefs addressing this key issue (we said), we would resolve their motions. *See id.* at 17:9 ("[C]ome back, refile, and then we'll address them at that time.").

So, here we are (again)—adjudicating Seabourn's Renewed Motion to Compel Arbitration (the "Motion to Compel") [ECF No. 26] and Cosgun's Renewed Motion to Remand (the "Motion to

---

[1] Much more on this later.

Remand") [ECF No. 27].[2] Conspicuously absent from these motions, however, is any analysis of the issue we raised at the hearing. *See generally* Motion to Compel; Motion to Remand. The parties, in other words, ignored just about everything we said at the hearing and refused to brief the *sole* issue we identified as important when we denied their previous motions.[3] It's typically not our role to make the parties' arguments for them. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) ("[I]t is inappropriate for a court to raise an issue *sua sponte* in most situations."). But, when the parties manage to raise the right issue—and then fail to make the correct arguments—we're not obliged to decide the question with blinders on. *See United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1350 (11th Cir. 2019) ("[T]he court is not limited to choosing one side's position or the other's. The court's role is to get it right, not to choose which side's argument is better and adopt it lock, stock, and barrel."); *see also Campbell*, 26 F.4th at 872 ("However, the party presentation principle is supple, not ironclad, and there are no doubt circumstances in which a modest initiating role for a court is appropriate." (cleaned up)). And that's particularly true in the circumstances we have here—where, after we called the parties in for a hearing, at which we laid out for them (in painstaking detail) the issues we wanted them to address, the parties elected to ignore our directions and to proceed (in essence) with the same misplaced arguments they'd raised before. We'll thus adjudicate both

---

[2] Both motions are fully briefed. *See* Cosgun's Response to the Motion to Compel Arbitration ("Motion to Compel Response") [ECF No. 30]; Seabourn's Reply in Support of the Motion to Compel Arbitration ("Motion to Compel Reply") [ECF No. 31]; Seabourn's Response to Cosgun's Motion to Remand ("Motion to Remand Response") [ECF No. 29]; Cosgun's Reply in Support of the Motion to Remand ("Motion to Remand Reply") [ECF No. 32].

[3] Cosgun, to his credit, at least acknowledges that we "requested argument on the source of this so-called 'reciprocity requirement' and whether its appearance in precedent is merely *obiter dicta*." Motion to Remand at 10. But he goes on to tell us only what we already knew at the hearing—*viz.*, (1) that the New York Convention allows signatory nations to issue limiting declarations and (2) that the United States issued such a declaration. *See ibid.* Both sides' briefing thus fails to answer the critical question we face here: Why was (part of) this limiting declaration omitted from the federal statute that implemented the Convention?

motions here—looking, without much help from the parties, "to get it right." *Undetermined Quantities*, 936 F.3d at 1350.

## THE LAW

In 1958, the United Nations Economic and Social Council adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention" or the "Convention"). "The New York Convention is a multilateral treaty that addresses international arbitration." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020). "The Supreme Court has explained that 'the principal purpose' behind the adoption of the Convention 'was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'" *Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 545 (11th Cir. 2016) (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n.15 (1974)).

Article II of the Convention "addresses the enforcement of arbitration agreements" and is divided into three parts. Article II(1) mandates that "[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration." Article II(2) defines "[t]he term 'agreement in writing'" to "include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Finally, Article II(3) *requires* courts to compel arbitration absent an affirmative defense: "The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to

arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."

"In 1970, the United States acceded to the New York Convention, and Congress enacted implementing legislation in Chapter 2 of the [Federal Arbitration Act (the "FAA")]." *GE Energy*, 140 S. Ct. at 1644; *see also* 9 U.S.C. §§ 201–08. The President and the Senate acceded to the Convention with two limiting declarations. *See generally* New York Convention. *First*, "[t]he United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." *Ibid.* We'll call this the "First Declaration." *Second*, "[t]he United States of America will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States." As you may have guessed, we'll refer to this as the "Second Declaration."

The Convention, on its own, "creates obligations only for State Parties and 'does not by itself give rise to domestically enforceable federal law' absent 'implementing legislation passed by Congress.'" *Bond v. United States*, 572 U.S. 844, 850–51 (2014) (quoting *Medellín v. Texas*, 552 U.S. 491, 505 (2008)); *see also Medellín*, 552 U.S. at 521–22 (citing the New York Convention as an example of a "non-self-executing treat[y]"). Now codified in a federal statute (*i.e.*, the FAA), the Convention is "enforce[able]" in United States courts in accordance with [the provisions of Chapter 2]." 9 U.S.C. § 201.

The FAA grants federal district courts "original jurisdiction" over "[a]n action or proceeding *falling under the Convention*," which "shall be deemed to arise under the laws and treaties of the United States." *Id.* § 203 (emphasis added). As a consequence, "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the

Convention, the defendant . . . may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States." *Id.* § 205.

And the FAA tells us *which* kinds of cases "fall under the Convention"—and thus trigger the original jurisdiction of federal district courts:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

*Id.* § 202. In other words, all *commercial* arbitration agreements involving *at least one foreign party* "fall[ ] under the Convention."[4] And, when an agreement "falls under the Convention," the court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." *Id.* § 206.

Congress enacted the FAA in 1925 to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991) (cleaned up). The original version of the FAA from 1925—which today appears in Chapter 1 of the statute—"applies residually to supplement the provisions of [Chapter 2 of the statute.]" *Bautista v. Star Cruises*, 396 F.3d 1289, 1297 (11th Cir. 2005).[5] That said, "Congress gave the treaty-implementing statute[ ] primacy in [its] field[ ]." *Ibid.*; *see also* 9 U.S.C. § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter

---

[4] As we'll explain below (*q.v.* our discussion of the FAA's jurisdictional requirements on pages 15–16), the FAA also includes a third element—that, to be valid, irrevocable, and enforceable, the arbitration agreement must be *in writing*.

[5] Chapter 1 of the FAA is "general in nature," *Bautista*, 396 F.3d at 1297, and primarily "governs domestic arbitration," *Suazo*, 822 F.3d at 547.

is not in conflict with this chapter or the Convention as ratified by the United States."); *Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*, 898 F.3d 1087, 1092–93 (11th Cir. 2018) ("Chapter 2 also applies Chapter 1 to all actions arising under Chapter 2 to the extent that the two Chapters do not conflict.").

## ANALYSIS

This case requires us to answer two questions: *First*, do we have jurisdiction over the parties' dispute? *Second*, if we do, *must* we compel the parties to arbitrate? At first glance, the answers to both questions seem simple. After all, as we've highlighted, the Convention and its implementing statute include only *three* jurisdictional prerequisites: the agreement must be in *writing*; it must govern a *commercial* dispute; and it must include at least one party who is *not* a citizen of the United States. Noticeably absent from this list is the *fourth* element Cosgun has insisted on—*viz.*, that the arbitration agreement specify that arbitration will be held in the territory of a signatory nation. Normally, that would be the end of that.

Unfortunately, our case won't end up being that easy. And that's because the Eleventh Circuit—*our* Circuit, whose *holdings* we must follow—has told us (albeit in *dicta*) that "the Convention requires that a motion to compel arbitration must be granted so long as (1) the **four** jurisdictional prerequisites are met and (2) no available affirmative defense under the Convention applies." *Suazo*, 822 F.3d at 546 (emphasis added & cleaned up). In other words, the Eleventh Circuit has been clear— and not just once—that Convention jurisdiction hinges on *four* elements (not three). And, of course, that fourth element—in the Circuit's view—is the same jurisdictional prerequisite Cosgun has said the Convention requires: *i.e.*, that the arbitration clause specify that the arbitration will be conducted in the territory of a signatory nation. As we hinted at the hearing, we've traced the origin of this (supposed) fourth element, through several published Eleventh Circuit decisions, back to a First Circuit case that, in our view, misreads the Convention and its implementing statute.

8

We're thus faced with a bit of a conundrum: Do we follow the *dicta* of several published Eleventh Circuit decisions—and, as we're about to show, it *is* plainly *dicta*—even though that *dicta* added a jurisdictional element that doesn't appear in the Convention (or the FAA) at all? Or do we disregard that *dicta*—and the First Circuit case it relies on—in favor of the unambiguous language of the Convention and the FAA themselves? As we'll see, in other circumstances, our Circuit has been clear that we should opt for the latter course. We therefore conclude that neither the Convention nor the FAA requires, as a jurisdictional prerequisite, that an arbitration clause stipulate that the arbitration will be conducted in the territory of a signatory nation. Having made that determination, we have little trouble finding *both* that we have jurisdiction over this dispute *and* that we must order the parties to arbitration.

## I. Jurisdiction

"In deciding a motion to compel arbitration under the Convention Act, a court conducts a very limited inquiry." *Bautista*, 396 F.3d at 1294 (cleaned up). To determine whether we have jurisdiction to compel the parties to arbitrate, we look to Chapter 2 of the FAA—the Convention's implementing statute. Chapter 2 confers on federal district courts "original jurisdiction" over any "action or proceeding *falling under the Convention*." 9 U.S.C. § 203 (emphasis added). When does an action fall under the Convention? Well, as we've said, an "arbitration agreement . . . arising out of a legal relationship … which is considered as *commercial* . . . falls under the Convention." *Id.* § 202 (emphasis added). That said, an agreement "entirely between citizens of the United States" does *not* "fall[ ] under the Convention[.]" *Ibid.* (emphasis added).

The text of Chapter 2 of the FAA thus includes *two* jurisdictional prerequisites to the enforcement of an arbitration agreement, and there's no dispute that our arbitration agreement satisfies both. *See generally* Motion to Compel Response (not disputing that the parties' arbitration

agreement arises out of a commercial legal relationship); Motion to Remand (same)[6]; *see also* Complaint ¶¶ 2, 6 (asserting that Cosgun is a "Turkish" citizen and that Seabourn is a "foreign corporation with its principal place of business in Seattle, Washington").

The Convention also includes a *third* jurisdictional prerequisite—*i.e.*, that the arbitration agreement must be "in writing." *See* Art. II(1) ("Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."); *see also Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1291 (11th Cir. 2004) ("Article II of the Convention imposes a prerequisite on a party asking the court to compel arbitration: it requires that the party bring the court the written agreement."). As we'll soon see, this *third* jurisdictional element also found its way into the FAA. *See infra* pp. 15–16. And there's no dispute that our parties' arbitration agreement is in writing. *See generally* Motion to Remand (not contesting this point).[7]

Taken together, then, the Convention and the FAA lay out *three* jurisdictional elements, and the parties' agreement appears to satisfy *all three*—thus placing our agreement squarely within the Convention's purview. And, since our arbitration agreement is governed by the Convention, Seabourn properly removed this action to federal court. *See* 9 U.S.C. § 205 ("Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement . . . falling under the Convention, the defendant . . . may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States[.]"). So far, so good.

---

[6] Although Cosgun agrees that his legal relationship with Seabourn is *commercial*, he thinks he qualifies for one of the Convention's defenses. *See* Motion to Remand at 12 ("Article II(3)'s 'null and void' defense renders the purported arbitration agreement unenforceable because U.S. domestic law voids arbitration clauses in seamen's employment contracts."). More on this later.

[7] For what it's worth, our arbitration agreement plainly governs Cosgun's claims. *See* Agreement at Art. 35(1) (agreeing to arbitrate "all grievances and any other dispute whatsoever" under the Convention); Motion to Remand (not disputing this point).

Despite how straightforward the analysis has seemed thus far, Cosgun insists that we lack jurisdiction to compel arbitration in this case. *See* Motion to Remand at 19 ("[T]he Court lacks subject matter jurisdiction[.]"). In Cosgun's view, because the arbitration agreement doesn't specify *where* the arbitration will take place, *see* Motion to Remand ¶ 7 ("The arbitration clause upon which SEABOURN relies does not require arbitration in any specific location whatsoever[.]")—*i.e.*, because it fails to specify that the arbitration will be conducted in the territory of a Convention signatory—the agreement doesn't trigger our original jurisdiction, *see id.* ¶ 6 ("The Convention allows enforcement of **only** arbitration clauses which require arbitration in the territory of a signatory to that treaty itself." (emphasis in original)).[8] And (Cosgun says), with "no enforceable arbitration agreement," we have no choice but to "remand the action for lack of jurisdiction[.]" *Id.* at 5.

In support of his argument, Cosgun cites *Outokumpu Stainless USA, LLC v. Converteam SAS*, where the Eleventh Circuit outlined the following four-factor test for determining whether an arbitration agreement is enforceable:

> [To] determine whether the notice of removal describes an arbitration agreement that may "fall[ ] under the Convention,' . . . . the district court . . . asks whether the removing party has articulated a non-frivolous basis (1) that there is an agreement in writing, that is, an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams; (2) *that the agreement provides for arbitration in the territory of a signatory of the Convention*; (3) that the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) that a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

---

[8] Cosgun also contends that we lack jurisdiction because he and his attorney "do not stipulate to arbitration within the jurisdiction of a signatory to the Convention." Motion to Remand ¶ 8. This is significant (Cosgun says) because the location of the arbitration must be chosen by a vote, *see* Agreement at Art. 35(3) ("Any arbitration shall take place in such place as is agreed upon by the Unions, Owners/Company and Seafarer. In the event that all three parties are unable to agree upon an alternative location, the agreement of any two of the three shall prevail."), and he and his lawyer count for two out of the three relevant votes, *see id.* ¶ 6 ("If Seafarer is represented by an independent counsel at any point, said counsel will substitute the Unions at all stages of the Procedure[.]"). But, since we ultimately conclude that the law *doesn't* require our agreement to specify *where* the arbitration will take place, Cosgun's (and his lawyer's) preferred forum is neither here nor there.

902 F.3d 1316, 1324 (11th Cir. 2018) (emphasis added) (citing *Bautista*, 396 F.3d at 1294 n.7). And Cosgun's right that our agreement never says *where* the arbitration will occur. It says only—as Cosgun notes—that the parties will arbitrate "in such place as is agreed upon by the Unions, Owners/Company and Seafarer." Agreement at Art. 35(3).

It's a clever argument—and not without appeal. In *Outokumpu*, after all, the Eleventh Circuit *did* say that district courts lack jurisdiction where, as here, the arbitration clause doesn't specify that the arbitration will occur in the territory of a Convention signatory. 902 F.3d at 1324 (requiring, as a jurisdictional prerequisite, "that the arbitration agreement provide[ ] for arbitration in the territory of a signatory of the Convention"). Two problems with this, though. *First*, this stray remark from *Outokumpu* is just *dicta*. Now, that wouldn't be too big a deal in normal circumstances: We generally try to follow the Eleventh Circuit's *dicta* when we can. But—and this is the *second* problem—this purported jurisdictional element (the one we find only in Circuit *dicta*) appears nowhere in *either* the Convention *or* the FAA. We'll take each of these problems in turn.

A.      The *Dicta*

To locate the origins of *Outokumpu*'s second jurisdictional element—the one that purports to require "that the agreement provide[ ] for arbitration in the territory of a signatory of the Convention," *ibid.*—we'll start with *Outokumpu* and work all the way back, through several *other* Eleventh Circuit decisions, to the element's supposed source: a mistaken opinion from the First Circuit. In *Outokumpu*, "[t]he parties concede[d] that the second and third *Bautista* factors [were] met," so the court "only examine[d] the first and fourth factors." *Ibid.* Since the parties in *Outokumpu* stipulated that the second factor—the one we're focusing on here—had been satisfied, the Eleventh Circuit never had occasion to analyze it. Indeed, the court said nothing more about it. At least as far as *Outokumpu* is concerned, then, this second element is pure *dicta*. *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) ("[D]icta is 'a statement that neither constitutes the holding of a case, nor arises from a part of the

opinion that is necessary to the holding of the case.'" (quoting *Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004))). And, as the Eleventh Circuit has time and again reminded us, "[t]he law cannot be established by dicta." *Santamorena v. Ga. Mil. Coll.*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) (quoting *Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir. 1996)); *see also In re United States*, 60 F.3d 729, 731 (11th Cir. 1995) ("Statements of dicta are not part of the law of the case."); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1578 (11th Cir. 1992) (*dicta* is "neither the law of the case nor binding precedent").

So, where did this *dicta* come from? Well, *Outokumpu*'s supposed second element first appeared in the Eleventh Circuit in footnote 7 of *Bautista*:

> These four [jurisdictional prerequisites] require that (1) there is an agreement in writing within the meaning of the Convention; (2) *the agreement provides for arbitration in the territory of a signatory of the Convention*; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

396 F.3d at 1294 n.7 (emphasis added).[9] Again, however, the *Bautista* Court didn't have to grapple with our second element because it was "beyond dispute that the second and fourth conditions [were] fulfilled in this case." *Ibid*. As with *Outokumpu*, therefore, this aspect of *Bautista* is *dicta*.

---

[9] There are several other Eleventh Circuit cases that cite this four-factor jurisdictional test between its latest appearance (in *Outokumpu*) and its first appearance (in *Bautista*). *See Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1272 n.10 (11th Cir. 2011) ("'The jurisdictional prerequisites mandate that: (1) there is an agreement in writing within the meaning of the Convention; (2) *the agreement provides for arbitration in the territory of a signatory of the Convention*; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.'" (emphasis added) (quoting *Bautista*, 396 F.3d at 1294 n.7)); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1285–86 (11th Cir. 2015) (citing *Bautista* for the same test); *Suazo*, 822 F.3d at 546 (same). As with *Outokumpu* and *Bautista*, however, the second element (the one we care so much about here) was at issue *in none of these cases*. *See Lindo*, 652 F.3d at 1276 n.17 ("On appeal, Lindo challenges none of these jurisdictional prerequisites."); *Escobar*, 805 F.3d at 1286 ("It is undisputed that the four jurisdictional requirements are met."); *Suazo*, 822 F.3d at 546 ("It is undisputed that the four jurisdictional prerequisites have been met."). So, in these cases too, the exposition of this four-factor test appeared only in *dicta*.

But where did *Bautista* get this four-factor test from? Well, our journey takes us next to the Third Circuit—specifically, to footnote 7 of *Standard Bent Glass Corp. v. Glassrobots Oy*, in which that court had this to say about Convention jurisdiction: "Where a dispute arises from an international commercial agreement, a court must address *four* factors to determine whether the arbitration agreement falls under [the Convention]." 333 F.3d 440, 449 (3d Cir. 2003) (emphasis added). But, in a now-familiar refrain, the Third Circuit *likewise* didn't address the *second* prerequisite because (it said) only the first—*i.e.*, whether there was "an agreement in writing to arbitrate"—was "at issue" in that case. *Ibid.* Indeed, as we've indicated, the Third Circuit relegated the other three (uncontested) elements to a footnote, noting that "[q]uestions two through four are not pertinent here." *Id.* at 449 n.13.[10] Once again, then, the second element appears only *dicta*.

## B.     This Second Element Doesn't Appear in the Convention or the FAA

As we've suggested, the Third Circuit got the four-factor test from a First Circuit case: *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186–87 (1st Cir. 1982). According to *Ledee*, "a court presented with a request to refer a dispute to arbitration pursuant to Chapter Two of the Federal Arbitration Act . . . . must resolve *four* preliminary questions." *Id.* at 186 (emphasis added). Those *four* questions, *Ledee* said, are:

1.  Is there an agreement in writing to arbitrate the subject of the dispute? Convention, Articles II(1), II(2).

2.  *Does the agreement provide for arbitration in the territory of a signatory of the Convention*? Convention, Articles I(1), I(3); 9 U.S.C. s 206; Declaration of the United States upon accession, reprinted in 9 U.S.C.A. at 154 n.29 (1982 Supp.).

---

[10] The footnote went on to explain that the other three "questions are: '(2) *Does the agreement provide for arbitration in the territory of a signatory of the Convention*?; (3) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial?; (4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states.'" *Standard Bent Glass Corp.*, 333 F.3d at 449 n.13 (emphasis added). Although the Third Circuit didn't provide a citation for the source of these three questions, our review of the relevant legal landscape suggests that, in saying so, the court was quoting from the First Circuit's decision in *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186–87 (1st Cir. 1982).

3.  Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial? Convention, Article I(3); 9 U.S.C. s 202.

4.  Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states? 9 U.S.C. s 202.

*Id.* at 186–187 (emphasis added).

After the second question—as we can see—the *Ledee* Court cited four things: (1) Article I(1) of the Convention; (2) Article I(3) of the Convention; (3) the FAA (specifically 9 U.S.C. § 206); and (4) the First Declaration the United States issued upon accession. To determine whether this second element *actually* appears in the Convention or the FAA, we "begin, as we must, with the text of [each document]." *United States v. Garcon*, 54 F.4th 1274, 1277 (11th Cir. 2022); *see also United States v. F.E.B. Corp.*, 52 F.4th 916, 926 (11th Cir. 2022) ("Because this is a case about the meaning of a statute, we begin 'with the statutory text, and end[ ] there as well if the text is unambiguous.'" (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004))); *Medellín*, 552 U.S. at 506 ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

The first, third, and fourth questions the First Circuit asked in *Ledee*—which, by way of the Third Circuit's decision in *Standard Bent*, ultimately passed through *Bautista* and, finally, *Outokumpu*—are easy: All plainly appear in the text of *either* the Convention *or* the FAA. As we've explained, the first jurisdictional element—that the agreement must be "in writing"—finds its roots in both documents. Article II(1) of the Convention provides that "[e]ach Contracting State shall recognize an *agreement in writing* under which the parties undertake to submit to arbitration[.]" (emphasis added). And, while Chapter 2 of the FAA doesn't require an agreement in writing, Chapter 1 does. Specifically, for an arbitration agreement to be "valid, irrevocable, and enforceable," Chapter 1 requires "a written provision" or "an agreement in writing to submit to arbitration[.]" 9 U.S.C. § 2. And (notably) Chapter

1 applies to actions brought under Chapter 2 "to the extent that [C]hapter [1] is not in conflict with [Chapter 2] or the Convention as ratified by the United States." *Id.* § 208. Since nothing in Chapter 2 conflicts with Chapter 1's writing requirement, to trigger our FAA jurisdiction, an arbitration agreement must be *in writing*.

The third *Ledee* factor—that the agreement must be "commercial"—appears unmistakably in the text of Chapter 2. *See id.* § 202 ("An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as *commercial* . . . falls under the Convention." (emphasis added)).[11]

Finally, the fourth *Ledee* factor—that the agreement include at least one foreign party—comes unambiguously from Chapter 2's jurisdictional grant. *See ibid.* ("An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention[.]").

But what about the second *Ledee* factor—the one that requires the agreement to "provide for arbitration in the territory of a signatory of the Convention," *Ledee*, 684 F.2d at 186? After laying out this second factor, remember, the First Circuit cited Articles I(1) and I(3) of the Convention, Section 206 of the FAA, *and* the First Declaration the United States issued when it acceded to the Convention. Unfortunately, these four sources provide *no support* for the First Circuit's second requirement.

Let's review the text of each source in turn. The *first*—Article I(1) of the Convention— provides that "[t]his Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such

---

[11] This is the part of the FAA that incorporates what we've called the Second Declaration (*q.v.* our discussion of "The Law" on page 6). For what it's worth, the Convention plainly allowed the United States to issue this kind of limiting declaration. *See* Agreement at Art. I(3) ("When signing, ratifying or acceding to this Convention . . . any State . . . . may also declare that it will apply the Convention only to differences arising out of legal relationships . . . which are considered as commercial under the national law of the State making such declaration.").

awards are sought[.]" The *second*—Article I(3) of the Convention—allows a signatory state "on the basis of reciprocity [to] declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State." The *third*—9 U.S.C. § 206—states: "A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." The *fourth* is the First Declaration our government issued when it acceded to the Convention: "The United States of America," President Nixon then declared, "will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State."

As we've said, from these four sources, the First Circuit determined that a district court *only* has jurisdiction to compel arbitration under an agreement that "provide[s] for arbitration in the territory of a signatory of the Convention." *Ledee*, 684 F.2d at 186. For four reasons, that's just not the case.

### 1. *Ledee*'s sources are relevant only to the confirmation of arbitral *awards*, not the enforcement of arbitration *agreements*

*Ledee*'s first, second, and fourth sources all deal with the confirmation of arbitral *awards*—a phase of the arbitration process that's entirely distinct from (and which necessarily follows) the enforcement of an arbitration *agreement*. As the Supreme Court has observed, "[the New York Convention] focuses almost entirely on arbitral *awards*." *GE Energy*, 140 S. Ct. at 1644 (emphasis added). "Only one Article of the Convention addresses arbitration *agreements*—Article II—and only one provision of Article II addresses the enforcement of those *agreements*—Article II(3)." *Id.* at 1645 (emphases added). The rest of the Convention—including, as relevant here, Articles I(1) and I(3)— focuses only on "awards."

So, what's the difference between the confirmation of an arbitral *award* and the enforcement of an arbitration *agreement*? Well, we needn't guess because the Convention tells us. It defines an

arbitration agreement as "an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration." New York Convention at Art. II(1). An arbitration agreement, in other words, is a kind of contract—executed by the parties—through which the parties select arbitration as their preferred dispute-resolution mechanism. An arbitral award, by contrast, is "made by arbitrators" or by "permanent arbitral bodies" *after* the arbitration has been completed. *See* New York Convention at Art. I(2). Agreements, then, come *before* the arbitration and tell us *where* the parties want their future disputes adjudicated, whereas awards come *after* arbitration and tell us *what* the arbitrators have decided. And what's especially important for our purposes is that each of these instruments—awards and agreements—comes with its own unique set of enforcement mechanisms.

So, to go back to *Ledee*'s four sources, let's start with Article I(1), which (as we're about to see) is completely irrelevant to our case. By its plain text, after all, that article applies only to the "recognition and enforcement of arbitral *awards*"—not agreements.[12] And the same is also true of both Article I(3) and the First Declaration. *See* Art. I(3) (allowing signatory states to declare that they will "apply the Convention to the recognition and enforcement of *awards* made only in the territory of another Contracting State" (emphasis added)); First Declaration (declaring that the United States will apply the Convention to the "recognition and enforcement of only those *awards* made in the territory of another Contracting State" (emphasis added)). The words in *all three* of these sources—Article I(1), Article I(3), and the First Declaration—are thus clear and unambiguous: Each governs *only* our obligations with respect to the enforcement of arbitral *awards*—not *agreements*. *See* SCALIA & GARNER

---

[12] In fact, all Article I(1) says is that the Convention applies whenever the *award* is entered in a country *other than* the forum country (*i.e.*, the country in which the award is being enforced). It's thus not at all relevant to the question we face here: *viz.*, whether we have *jurisdiction* to send the parties to arbitration in the first place.

at 69 ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."); *see id.* at 94 ("Nothing is to be added to what the text states or reasonably implies.").

And, in fact, our Circuit has been clear that actions to compel arbitration and actions to confirm arbitral awards are "two separate stages of enforcement." *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1263 (11th Cir. 2011). The Convention's implementing statute, the Eleventh Circuit has said, "provides two causes of action in federal court for a party seeking to enforce arbitration agreements covered by the New York Convention: (1) an action to *compel arbitration* in accord with the terms of the agreement, and (2) at a later stage, an action to *confirm an arbitral award* made pursuant to an arbitration agreement[.]" *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1286 (11th Cir. 2015) (emphases in original & cleaned up). "These two stages of enforcement are known as (1) the arbitration-enforcement stage and (2) the award-enforcement stage." *Ibid.*; *see also Lindo*, 652 F.3d at 1262–63 (contrasting "the initial arbitration-enforcement stage" with "the award-enforcement stage"); *Czarina*, 358 F.3d at 1291 ("To determine whether an award falls under the Convention, and thus, whether the district court has jurisdiction over the action to compel arbitration or to confirm an award, courts look to the language of the Convention. The Convention imposes prerequisites to both types of actions." (cleaned up)).

Our Circuit's analysis in *Lindo*—which interpreted *the very same language* at issue here to mean that Article V of the Convention applies *only* to the enforcement of arbitral *awards*—is particularly instructive today. *See* 652 F.3d at 1280–81. Looking to the plain text of the Convention (as well as some *dicta* from the Supreme Court), *Lindo* held that "Article V applies only at the arbitral award-enforcement stage and not at the arbitration-enforcement stage at issue[.]" *Id.* at 1280. The *Lindo* panel noted that Article V's public-policy defense "by its own terms applies when the '[r]ecognition and enforcement of an arbitral award' is sought[.]" *Id.* at 1268 (cleaned up); *see also id.* at 1280 ("Article V expressly provides, '*Recognition and enforcement of an arbitral award* may also be refused if the competent

authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be *contrary to the public policy of that country*.' Yet, Article V has no application in the interlocutory procedural posture of this case, where [the defendant] seeks to enforce arbitration at the outset of the dispute." (emphases in original)).

Just so with the provisions we're addressing here—which, recall, are Article I(1), Article I(3), and the First Declaration. By their very terms, all three apply to the "recognition and enforcement of only those *awards* made in the territory of another Contracting State." First Declaration (emphasis added); *see also* Art. I(1) ("This Convention shall apply to the recognition and enforcement of arbitral *awards*[.]" (emphasis added)); Article I(3) (allowing signatory states to declare that they will "apply the Convention to the recognition and enforcement of *awards* made only in the territory of another Contracting State" (emphasis added)). Because the enforcement of an *award* is "a *separate action* under federal law," *Lindo*, 652 F.3d at 1279 (emphasis in original), the requirement that the award be entered in a fellow signatory state is thus relevant only "at the award-enforcement stage, not at the arbitration-enforcement stage," *id.* at 1281.

 2. **The requirement that an award be enforced only if it was entered in a signatory nation is not a *jurisdictional* prerequisite—even at the award-enforcement stage**

*Ledee*'s second requirement isn't *jurisdictional*—even at the award-enforcement stage. If anything, it's simply an affirmative defense to the court's confirmation of an arbitral award, which can be asserted at the award-enforcement stage under 9 U.S.C. § 207. It thus has nothing to do with our case.

So, when does a federal court have jurisdiction over an arbitral *award* under Chapter 2? Well, we've already learned that Congress granted federal district courts jurisdiction over arbitration actions through §§ 202 & 203 of the FAA. And, as we've seen, these provisions require two things: (1) the award must be *commercial*, and (2) the dispute (and the subsequent award) must involve at least one

foreign party. That's it.[13] Only Seabourn's failure to satisfy one of *these* two elements could deprive us of *jurisdiction* to enforce an arbitral *award*.

If we have jurisdiction, then we must "confirm the award unless [we] find[ ] one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. What grounds does the Convention specify? Well, most of them can be found in Article V, which (as we know) likewise "applies at the award-enforcement stage." *Lindo*, 652 F.3d at 1263. "Article V . . . enumerates seven defenses that . . . are directed at courts considering whether to recognize and enforce an arbitral award." *Ibid.* And the First Declaration is probably also a valid reason to refuse to enforce an award under § 207. Either way, though, none of this has anything to do with our *jurisdiction* to compel arbitration in this case.

### 3.   The First Declaration isn't binding in federal court

Even if the First Declaration were somehow relevant to the enforcement of arbitration agreements (it isn't)—and even if it were jurisdictional (it's not)—it still wouldn't help Cosgun because it isn't binding in federal court. Unlike the Second Declaration, the First never made it into the text of the FAA. As we've said, the Supreme Court has made clear that the Convention is *not* self-executing. *See Medellín*, 552 U.S. at 505 (citing the New York Convention as an example of a "non-self-executing treat[y]"). The Convention thus "do[es] not by [itself] function as binding federal law." *Id.* at 504. What *is* "binding federal law enforceable in United States courts," *ibid.*, is the Convention's implementing statute—Chapter 2 of the FAA, *see id.* at 504 ("[W]hile treaties may comprise international

---

[13] As we've explained—*see supra* pp. 15–16—both the Convention (Art. II) and the FAA (9 U.S.C. § 2) also require, as a condition to sending the parties to arbitration *in the first instance*, that the arbitration agreement be in *writing*. But that requirement doesn't appear to apply to the confirmation of arbitral *awards*. In other words, if an arbitration panel in a signatory nation were (erroneously) to enter an arbitral award pursuant to an arbitration agreement that *wasn't* in writing, a federal district court in the United States *might* well have jurisdiction to enforce that award. Of course, none of this is relevant here.

commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.").

And, as we've already noted, our implementing statute is *crystal clear* about when a federal court has jurisdiction to enforce an arbitration agreement: The district courts "have original jurisdiction," the FAA says, over "[a]n action or proceeding falling under the Convention." 9 U.S.C. § 203. An arbitration agreement "falls under the Convention" when it arises out of a "commercial" legal relationship that's not "entirely between citizens of the United States[.]" *Id.* § 202. And, to be enforceable, the agreement must be "in writing." *Id.* § 2; *see also id.* § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."); New York Convention at Art. II(1) ("Each Contracting State shall recognize an agreement in writing[.]").

Especially in the circumstances we have here, "[n]othing is to be added to what the text states or reasonably implies." SCALIA & GARNER at 94. Remember that the United States acceded to the New York Convention with two limiting declarations. In the First Declaration, the United States announced that it would "apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those *awards* made in the territory of another Contracting State." First Declaration (emphasis added). And, in the Second, the United States said that it would "apply the Convention only to differences arising out of legal relationships . . . which are considered as commercial[.]" Second Declaration. As we've explained, the Convention plainly allowed the United States to issue these declarations. *See* New York Convention at Art. I(3) ("When signing, ratifying or acceding to this Convention . . . any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships . . . which are considered as commercial[.]"). The point is that these declarations were *voluntary*

limitations *we* imposed on ourselves; they weren't *requirements* of the Convention itself. So, if the United States, in acceding to the treaty, issued a declaration, but then declined to include that declaration in the treaty's implementing statute, that declaration wouldn't bind our domestic judiciary. It might bind our country as an *international* obligation we owe to *other* states—"[b]ut not all international law obligations automatically constitute binding federal law enforceable in United States courts." *Medellín*, 552 U.S. at 504.

Which brings us to the crux of this whole issue: While Congress unambiguously included the Second Declaration in the text of the FAA, *see* 9 U.S.C. § 202 ("An arbitration agreement . . . arising out of a legal relationship . . . which is considered as commercial . . . falls under the Convention."), it notably omitted the First Declaration (the one Cosgun relies on here), *see generally* 9 U.S.C. §§ 201–208. And we think "[t]his silence is dispositive here[.]" *GE Energy*, 140 S. Ct. at 1645; *see also* SCALIA & GARNER at 93 ("[A] matter not covered is to be treated as not covered."). After all, "Congress knows how to accord domestic effect to international obligations when it desires such a result." *Medellín*, 552 U.S. at 522. And Congress did just that when it incorporated the Second Declaration into the enacting statute. *See* 9 U.S.C. § 202. But, because Congress chose *not* to include the First Declaration in that same statute, we conclude that Congress didn't intend for that declaration to bind us. *See Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (quoting *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015))); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *cf. Savage Servs. Corp. v. United States*, 25 F.4th 925, 935 (11th Cir. 2022) (refusing to read into the Oil Pollution Act a waiver of sovereign immunity because "Congress, in short, knows how to waive sovereign immunity when it

wants to"). In other words, even if the First Declaration had anything to do with the enforcement of arbitration agreements, it would still have no bearing on our case.

> **4.     9 U.S.C. § 206 doesn't require an arbitration agreement to specify *where* the arbitration will take place**

And that brings us all the way back to the First Circuit's decision in *Ledee*—which cited § 206 of Chapter 2 as support for its contention that an arbitration "agreement [must] provide for arbitration in the territory of a signatory of the Convention[.]" 684 F.2d at 186. We don't think § 206 operates that way.

Section 206 "empowers courts to compel arbitration[.]" *GE Energy*, 140 S. Ct. at 1644. It provides that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. The First Circuit seems to have assumed that, because § 206 permits courts to order arbitration in the place where the parties agreed to arbitrate, the arbitration agreement *must* include the place of arbitration. But § 206 doesn't say that.

Recall that "Chapter 2 [of the FAA] also states that 'Chapter 1 applies to actions and proceedings brought under this chapter to the extent that [Chapter 1] is not in conflict with this chapter or the Convention.'" *GE Energy*, 140 S. Ct. at 1644 (quoting 9 U.S.C. § 208). And, under Chapter 1—specifically, § 4 of Chapter 1—"if the parties agreed to arbitrate, but failed to 'provide[ ] for' a forum, then the court must compel arbitration, but only within its own district[.]" *Internaves*, 898 F.3d at 1092; *see also* 9 U.S.C. § 4 ("The hearing and proceedings, under [an arbitration] agreement, shall be within the district in which the petition for an order directing such arbitration is filed."); *see also Jain v. de Mere*, 51 F.3d 686, 690 (7th Cir. 1995) ("[9 U.S.C.] § 4 not only permits but requires a court to compel arbitration in its own district when no other forum is specified."). So, the question before us is whether § 4 conflicts with *either* the Convention *or* Chapter 2 of the FAA. The Ninth and Seventh Circuits held that it does not—and that § 4 thus operates whenever a Chapter 2 arbitration

agreement lacks an agreed-upon forum.[14] *See Jain*, 51 F.3d at 690 ("[W]e conclude § 4 is clearly applicable when an arbitration agreement fails to specify a place for arbitration."); *Bauhinia Corp. v. China Nat'l Mach. & Equip. Imp. & Exp. Corp.*, 819 F.2d 247, 250 (9th Cir. 1987) ("In the absence of a term specifying location, a district court can only order arbitration within its district."). We agree.

There's plainly no conflict between § 4 and the text of the Convention. "'The interpretation of a treaty, like the interpretation of a statute, begins with its text.'" *GE Energy*, 140 S. Ct. at 1645 (quoting *Medellín*, 552 U.S. at 506). And the Convention is "simply silent," *ibid.*, on whether a district court in the United States can, should, or may compel arbitration—or, indeed, where arbitration should occur at all. As an international agreement that's intended to bind over 170 signatory nations, this lack of direction for the domestic courts of individual states makes sense. *See* UNCITRAL, Status: Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958), https://uncitral.un.org/en/texts/arbitration/conventions/foreig n_arbitral_awards/status2 (listing the treaty's signatory nations). The Convention likewise doesn't require, as a precondition for the parties to "have made an agreement within the meaning of [the Convention]," Art. II(3), that arbitration agreements specify *where* the arbitration will occur, *see* Art. II(1) ("Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration . . . differences which have arisen or which may arise between them in respect of a defined legal relationship . . . concerning a subject matter capable of settlement by arbitration."); Art. II(2) ("The

---

[14] The Eleventh Circuit cited the Seventh Circuit's analysis approvingly in *Internaves*:

> However, if the parties agreed to arbitrate, but failed to "provide[ ] for" a forum, then the court must compel arbitration, but only within its own district pursuant to the provisions found in Chapter 1. 9 U.S.C. § 4 ("The hearing and proceedings, under [an arbitration] agreement, shall be within the district in which the petition for an order directing such arbitration is filed."); *see also Jain v. de Mere*, 51 F.3d 686, 690 (7th Cir. 1995) ("[9 U.S.C.] § 4 not only permits but requires a court to compel arbitration in its own district when no other forum is specified.").

898 F.3d at 1092–93.

term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams."). There is, then, no conflict between § 4 and the text of the Convention.

Nor does § 4 conflict with § 206, the provision of Chapter 2 that "empowers courts to compel arbitration[.]" *GE Energy*, 140 S. Ct. at 1644. When an arbitration agreement fails to specify a forum, "§ 4 and § 206 conflict only if one assumes that Congress intended § 206 to be the exclusive method by which courts could order arbitration." *Jain*, 51 F.3d at 690. But the language of § 206 is *permissive*, not mandatory: A court, that Section says, "*may* direct that arbitration be held . . . at any place therein provided for[.]" 9 U.S.C. § 206 (emphasis added); *see also* SCALIA & GARNER at 112 ("[P]ermissive words grant discretion. . . . The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive[.]"). In other words, § 206 "contains no exclusionary language; it does not state that arbitration agreements shall be enforced *only* in the identified circumstances." *GE Energy*, 140 S. Ct. at 1645 (emphasis in original); *see also Jain*, 51 F.3d at 690 (concluding that § 4 applied given "the absence of any explicit statement making § 206 exclusive"). As the Seventh Circuit has explained, since § 206 *isn't* "the exclusive method by which courts could order arbitration," Sections 4 and 206 do not conflict. *Jain*, 51 F.3d at 690; *see also ibid.* ("[W]e conclude § 4 is clearly applicable when an [international] arbitration agreement fails to specify a place for arbitration.").

We thus agree with the Seventh Circuit that § 4—far from conflicting with the Convention or Chapter 2—"supplement[s] § 206 by giving a court the ability to compel arbitration in its own district" when an international arbitration agreement "contains no provision for location." *Ibid.* Section 206, in short, doesn't curtail our jurisdiction to compel arbitration in this case.

* * *

As we've seen, then, neither the Convention nor the FAA requires an arbitration agreement, as a prerequisite to our jurisdiction, to specify the arbitral forum. Because Seabourn has satisfied the

26

*three* jurisdictional elements set forth in *both* the Convention *and* its implementing statute, we have jurisdiction to compel arbitration—and, indeed, must do so unless Cosgun has successfully pled an affirmative defense.

## II.   Affirmative Defenses

At the initial arbitration-enforcement stage, Article II of the Convention *requires* us to refer the parties to arbitration when they've made an agreement that falls under the Convention, "unless [the Court] finds that the said agreement is null and void, inoperative or incapable of being performed." New York Convention at Art. II(3); *see also* 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]"). This is "the only affirmative defense to arbitration" at this stage of the case. *Escobar*, 805 F.3d at 1286. "The limited scope of the Convention's null and void clause 'must be interpreted to encompass only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale.'" *Bautista*, 396 F.3d at 1302 (citing *DiMercurio v. Sphere Drake Ins. PLC*, 202 F.3d 71, 80 (1st Cir. 2000)).

Relying on the Supreme Court's recent decision in *GE Energy*, Cosgun correctly contends that "United States law determines whether purported arbitration agreements are enforceable under the Convention in U.S. courts." Motion to Remand at 12. From this premise, however, Cosgun advances two arguments—both of which push far beyond the "limited scope of the Convention's null and void clause." *First*, Cosgun says that the Agreement is "null, void, and unenforceable" under "the law of these United States," *id.* at 13, because "the FAA expressly excludes arbitration clauses in seamen's employment contracts from its reach," *id.* ¶ 9. *Second*, he maintains that the Agreement is "null, void, and unenforceable" under "the law of these United States," *id.* at 13, because "federal statutory law" and "federal public policy" somehow void the Agreement, *id.* at 18. We address—and reject—each argument in turn.

### A.      The Seamen's Exemption

*First*, Cosgun insists that Chapter 1 of the FAA exempts from the Convention's reach employment contracts with seamen. *See id.* at 12 ("U.S. domestic law voids arbitration clauses in seamen's employment contracts."). But the Eleventh Circuit has *expressly* rejected this argument, *see Bautista*, 396 F.3d at 1296—and nothing in *GE Energy* undermined that decision.

In *Bautista*, the Eleventh Circuit held that "[t]he statutory framework of [the FAA] and the language and context of the Convention Act [*i.e.*, Chapter 2 of the FAA] preclude the application of [Chapter 1 of] the FAA seamen's exemption" to arbitration agreements governed by Chapter 2. *Ibid.* This "seamen's exemption" is contained in Chapter 1 of the FAA—which, in defining commerce, provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. But recall that the strictures of Chapter 1 apply to Chapter 2 "only to the extent that [Chapter 1] is not in conflict" with the Convention or Chapter 2. *Escobar*, 805 F.3d at 1285 (quoting 9 U.S.C. § 208). And, in *Bautista*, the Eleventh Circuit determined that "[a] conflict exists between the FAA seamen exemption, which is narrow and specific, and the language of the Convention and [Chapter 2 of the FAA], which is broad and generic." *Bautista*, 396 F.3d at 1299. Under Chapter 2, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202. Here, *Bautista* was clear, Chapter 2 "covers commercial legal relationships *without* exception[.]" *Bautista*, 396 F.3d at 1299 (emphasis added). Having thus identified an obvious conflict between Chapter 2's *exception-less* application to commercial relationships and the seamen's exemption of Chapter 1, the court found "no justification for removing from [Chapter 2's] scope a subset of commercial employment agreements." *Id.* at 1300.

Still resisting, however, Cosgun maintains that the Supreme Court abrogated *Bautista* in *GE Energy*. The question in *GE Energy* was whether certain state-law doctrines—applicable under Chapter 1 of the FAA—conflicted with the Convention. *See GE Energy*, 140 S. Ct. at 1644–45 ("We must determine whether the equitable estoppel doctrines permitted under Chapter 1 of the FAA 'conflict with . . . the Convention.'" (cleaned up)). "Applying familiar tools of treaty interpretation," the Court concluded that "nothing in the text of the Convention 'conflict[s] with' the application of domestic equitable estoppel doctrines[.]" *Id.* at 1645. Since the Convention is "simply silent" as to "whether nonsignatories may enforce arbitration agreements under domestic doctrines such as equitable estoppel"—and because "Article II(3) contains no exclusionary language"—the Court found the Convention's silence "dispositive." *Ibid.*

For two reasons, we don't think *GE Energy* helps Cosgun here. *One*, the relevant provision of Chapter 2 isn't (as the Convention in *GE Energy* was on the doctrine of equitable estoppel) *silent* on the application of the seamen's exemption. Chapter 2, remember, says that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, *including a transaction, contract, or agreement described in section 2 of this title*, falls under the Convention." 9 U.S.C. § 202 (emphasis added). The portion of Chapter 2 we've highlighted is, of course, a reference to § 2 of Chapter 1, which provides:

> A written provision in *any maritime transaction* or a contract evidencing a transaction involving *commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

*Id.* § 2 (emphases added). And, as we've seen, § 1 of Chapter 1 defines the terms "maritime transactions" and "commerce" in a way that creates our "seamen's exemption." *Id.* § 1.

As this summary of the statutory scheme should make plain, "section 202 [of Chapter 2] does *not* incorporate section 2 of [Chapter 1] as an *exhaustive* description of the Convention Act's scope. Rather, section 202 [of Chapter 2] uses section 2 [of Chapter 1] as an illustration of the types of agreements covered by the Convention Act." *Bautista*, 396 F.3d at 1297 (emphases added). In other words, as the *Bautista* Court correctly recognized:

> [Chapter 2's] reference to section 2 [of Chapter 1] does not indicate an intent to limit the definition of "commercial" to those described in section 2 of [Chapter 1] as modified by section 1 [of Chapter 1]; the expansive term "including" would be superfluous if [Chapter 1 of] the FAA provided the full and complete definition. "Including" demonstrates that, at the very least, Congress meant for "commercial" legal relationships to consist of contracts evidencing a commercial transaction, as listed in section 2 [of Chapter 1], as well as similar agreements. *See Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 4, 86 L.Ed. 65 (1941) ("the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968) ("The word 'includes' is usually a term of enlargement, and not of limitation. . . . It therefore conveys the conclusion that there are other items includable, though not specifically enumerated by the statutes."). We therefore understand the reference to section 2 of [Chapter 1 of] the FAA to be generally illustrative of the commercial legal relationships covered by section 202 [in Chapter 2]. The illustration rendered by section 2 [of Chapter 1] includes employment agreements and makes no mention of the section 1 [of Chapter 1] seamen exemption. *Cf.* [*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113–14 (2001)] (construing section 2 and rejecting the proposition that an employment contract is not a "contract evidencing a transaction involving interstate commerce"). Accordingly, the terms of the Convention Act do not provide that we read section 1 [of Chapter 1] into section 202 [*i.e.*, Chapter 2].

*Id.* at 1297–98.

We agree with the Eleventh Circuit's reasoning and find nothing in *GE Energy* to contradict it. In Chapter 2, after all, Congress elected to incorporate the limited definition of Chapter 1 as *only a part* of the full scope of the commercial relationships covered by Chapter 2. That's what Chapter 2's purposeful use of the word "including" necessarily means. And, since Congress passed Chapter 2 decades after it had promulgated Chapter 1, we can presume that, in expanding the scope of Chapter 2, it knew about the seamen's exemption and chose *not* to incorporate it. Since Congress thus wasn't, strictly speaking, *silent* (as the Convention was in *GE Energy*) on whether it wanted to hoist into Chapter

2 the same limited definition of commerce it had included in Chapter 1, we reject Cosgun's attempt to deploy the seamen's exemption as an affirmative defense in this case.

*Two*, in *GE Energy*, the Supreme Court was clear that the Convention "requires courts to rely on domestic law to fill the gaps" *in the Convention*—and that, because the Convention operates against the backdrop of domestic law, it "does not set out a comprehensive regime that displaces domestic law." *GE Energy*, 140 S. Ct. at 1645. In other words, when the Convention is, as it often will be, silent on a specific point of law—there, on the applicability of the doctrine of equitable estoppel—*domestic* law must "fill the gaps." Here, however, we aren't faced with a potential conflict between an age-old domestic doctrine and the broad strokes of an international treaty. Here, instead, we have a *domestic* law, passed by Congress, that appears purposefully to *exclude* an exemption Congress had included in an earlier *domestic* law. In these circumstances, *GE Energy*'s justifiable concern that courts would use the skeletal framework of an international convention to supersede well-established principles of U.S. domestic law is neither here nor there.[15]

## B.    Federal Law and Public Policy

*Second*, Cosgun says that his arbitration agreement is "void and otherwise unenforceable under the Jones Act, the FAA, FELA, the Limitation of Liability Act, and federal public policy as expressed in the general maritime law of the United States." Motion to Remand at 18. In Cosgun's view, the

---

[15] Cosgun cites *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 536 (2019), for his view that our arbitration clause is unenforceable under domestic law—and, therefore, unenforceable under the Convention. *See* Motion to Remand ¶ 9 ("[T]he arbitration clause is 'null and void' within the meaning of the Convention, and therefore unenforceable, because the FAA expressly excludes arbitration clauses in seamen's employment contracts from its reach."). But *New Prime Inc.* is inapposite here: The Supreme Court in that case was analyzing the application of the seamen's exemption to a *domestic* arbitration agreement governed *only* by Chapter 1 of the FAA. *See generally* 139 S. Ct. 532 (resolving, under Chapter 1, whether the term "contracts of employment" applies to "independent contractors"). For agreements governed by Chapter 2, however, we look to Chapter 1 *only* when it doesn't conflict with Chapter 2. *See* 9 U.S.C. § 208 ("Chapter 1 applies to actions and proceedings brought under [Chapter 2] to the extent that chapter is not in conflict with [Chapter 2] or the Convention as ratified by the United States."). And, as we've just established, there *is* a conflict in the circumstances of our case between Chapters 1 and 2.

Convention "fails to define" the phrase "null and void"—which is a problem (Cosgun insists) because, in *GE Energy*, the Supreme Court held that "'the Convention requires Courts to rely on domestic law to fill the gaps[.]'" *Id.* at 13 (quoting *GE Energy*, 140 S. Ct. at 1645). Once again, we're unpersuaded.[16]

The Convention (it's true) doesn't define what it means for an arbitration agreement to be "null and void." But the Supreme Court has told us that "the Convention requires courts to rely on domestic law to fill the gaps[.]" *GE Energy*, 140 S. Ct. at 1645. And that's exactly what Chapter 1 of the FAA—a *domestic* law that, under § 208, fills gaps in Chapter 2 when it doesn't conflict with *either* Chapter 2 *or* the Convention—does. Under 9 U.S.C. § 2 (a part of Chapter 1), an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." And, as the Supreme Court has explained, "this provision requires federal courts to place arbitration agreements upon the same footing as other contracts." *GE Energy*, 140 S. Ct. at 1643 (cleaned up) (citing *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989)). So, to determine whether an arbitration agreement is *unenforceable*, we look to the "traditional principles of state [contract] law that apply under Chapter 1." *Ibid.* (cleaned up).

That, of course, is precisely what the Eleventh Circuit did in *Bautista* and *Escobar*: "The null-and-void clause," that court said, "encompasses *only* those defenses grounded in standard breach-of-contract defenses—such as fraud, mistake, duress, and waiver—that can be applied neutrally before international tribunals." *Escobar*, 805 F.3d at 1286 (emphasis added) (citing *Bautista*, 396 F.3d at 1302). Since Cosgun doesn't even try to show that any of these breach-of-contract defenses save him here, we won't follow him down the rabbit-hole of inapplicable federal statutory schemes he's cited.

---

[16] Cosgun made essentially this same argument in his original Motion to Remand [ECF No. 11]. At our hearing on that motion, we told the Plaintiff that the argument had already been "rejected by the Eleventh Circuit," Hr'g Tr. at 28:15–16, and that, while he was welcome to "reraise" it, it was "going to get rejected," *id.* at 28:16–17. In saying all this, we cautioned the Plaintiff to "use [his] time . . . wisely" in crafting his renewed motion, *id.* at 28:17–18—a warning that apparently went unheeded.

Finally, Cosgun's argument that the Agreement contravenes "public policy" because "seamen . . . are emphatically the wards of the court," Motion to Remand at 16 (cleaned up), is inappropriate at this stage of the proceedings. A party to an arbitration agreement can *only* raise a public-policy defense at the *award*-confirmation stage. *See Lindo*, 652 F.3d at 1280–82 ("Article V applies only at the arbitral award-enforcement stage and not at the arbitration-enforcement stage at issue here. . . . [W]e hold that [the Plaintiff] cannot raise an Article V public policy defense at this initial arbitration-enforcement stage."); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638 (1985) ("Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed. The Convention reserves to each signatory country the right to refuse enforcement of an award where the 'recognition or enforcement of the award would be contrary to the public policy of that country.'" (quoting New York Convention at Art. V)). By contrast, Article II(3)—"the only provision of the Convention that addresses the enforcement of arbitration *agreements*," *GE Energy*, 140 S. Ct. at 1645 (emphasis added)—"contains no explicit or implicit public-policy defense at the initial arbitration-enforcement stage," *Escobar*, 805 F.3d at 1287 (citation omitted).

*** 

Cosgun has thus failed to plead any viable affirmative defenses.

## CONCLUSION

Because we have jurisdiction to compel arbitration in this case—and since Cosgun has failed to plead a viable affirmative defense—we now **GRANT** the Defendant's Motion to Compel Arbitration and **DENY** Cosgun's Motion to Remand. And, given that the parties "agreed to arbitrate, but failed to provide for a forum," we "must compel arbitration, but only within [our] own district pursuant to the provisions found in Chapter 1." *Internaves*, 898 F.3d at 1092 (cleaned up) (citing 9

U.S.C. § 4). We therefore **STAY** the case and **ORDER** the parties to submit their dispute to arbitration in the Southern District of Florida. *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992) ("Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration." (citing 9 U.S.C. § 3)).

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Defendant's Motion to Compel Arbitration [ECF No. 26] is **GRANTED**.

2. The Plaintiff's Motion to Remand [ECF No. 27] is **DENIED**.

3. The parties shall submit their dispute to arbitration in the Southern District of Florida.

4. This case is **STAYED** pending the completion of arbitration.

5. This case shall remain **CLOSED**. All pending deadlines are **TERMINATED**, and any pending motions are **DENIED AS MOOT**.

6. Every **ninety days** from the date of this Order, the parties shall jointly file a report on the status of their arbitration proceedings.

7. Within **fifteen** days of the arbitration's conclusion, the parties shall jointly file a notice briefly describing the outcome of that arbitration.

**DONE AND ORDERED** in the Southern District of Florida on March 28, 2023.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record